Filed 5/19/26  P. v. Thomas CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVION THOMAS et al,<br><br>Defendants and Appellants. | B331861<br><br>Los Angeles County<br>Super. Ct. No. MA081385 |

APPEAL from judgments of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant Davion Thomas.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant Wesley Vaughn Jones.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

Appellants Davion Thomas and Wesley Vaughn Jones challenge their convictions for second degree murder of Lashawn Coleman. Thomas claims ineffective assistance of counsel for failure to present evidence of his mental condition, outrageous governmental conduct based on the detectives allowing witnesses to remain together prior to their interviews, prosecutorial misconduct for calling these witnesses to testify, and ineffective assistance of counsel for not moving to exclude their testimony at trial. Jones argues that the trial court erred by declining to instruct the jury on involuntary manslaughter as a lesser included offense. We reject their claims and affirm.

**FACTS AND PROCEDURAL BACKGROUND**

## I. The Facts

### A. *Derlene Shaw*

Lashawn Coleman, also known as Teena, was an in-home caretaker for 72-year-old Derlene Shaw. She periodically lived with Shaw.

Shaw met Jones through mutual friends and knew him as "Country." Jones met Coleman through Shaw and developed a relationship. Shaw observed Jones and Coleman arguing on prior occasions. Once or twice, Shaw saw Coleman with injuries, such as a black eye or injured lip.

On the night of May 21, 2021, Shaw had a get together at her apartment at 737 Jackman Street in Lancaster, California to celebrate her release from the hospital after being hit by a car. Several friends were with her, including "Badass," "Shay," "Papa Red," "Freckles," Marilyn Adams, "Carla," James Ramires, and Coleman. Shaw and many of the others were drinking alcohol, smoking marijuana, and using cocaine.

Earlier in the day, Jones called Shaw's apartment and asked who was present. Shaw told him that Coleman was not there. Coleman did not want her to tell Jones she was present because she was getting ready to go to the store. Coleman went to the store with Ramires and returned to Shaw's apartment.

At 10:00 p.m. or 11:00 p.m., Jones arrived. He knocked on the door and Badass opened it. Jones and another man entered. The other man wore a mask and appeared to have an item in his hand and placed it in his pocket. The other man waved hello.

After Jones entered, he talked with Coleman about returning his items. Coleman agreed to return the items, but their conversation escalated into an argument. They remained in the hallway at the front of the apartment during their argument. Shaw told them to " 'cut it out' " and " 'just talk.' " Jones pushed Coleman. She pushed him back and said, " 'Don't hit me.' " Shaw stated, " 'Don't hit that girl.' " Jones and Coleman began hitting one another with Jones hitting her first. Coleman fought back. Shaw said, " 'Why don't you just stop, Country. Leave her alone. She is going to get it for you.' "

During the time that Jones was talking with Coleman, Jones's companion was hanging back by the front door. Shaw saw that Jones's companion had a gun behind him when he entered the apartment and then had it down in his pocket. Coleman went to her purse and Jones pushed her again. Coleman hit Jones and he fell back on the couch. Coleman again went to her purse and said, " 'I'm getting it.' " Jones turned around and looked at Coleman. Shaw initially thought Coleman then stabbed Jones. But she determined that Coleman sprayed Jones when he stated to his companion, " 'That bitch sprayed me. Shoot that bitch.' " Shaw saw Jones's companion raise a gun.

3

She said, "He got a gun." Shaw heard gunfire. Coleman grabbed her shoulder and said, "That bitch shot me" or "that nigga shot me." Coleman fell as she walked toward the living room. Shaw heard Jones say, "I didn't want her dead. I didn't want to kill her," or " 'I didn't want you to kill her.' " Shaw said, " 'Somebody call 911. She's been shot.' "

After the shooting, Jones and his companion ran out the door. Jones's companion left first. Before leaving, Jones was at the bathroom door, and Shaw heard him say, " 'I didn't want her to die,' " " 'I didn't want him to shoot her,' " or " 'I didn't want to kill her.' " When Jones walked out of the apartment, he returned to a sliding glass door by a television. Shaw was tending to Coleman. Shaw heard Jones say, "I didn't want to shoot you. I didn't want to kill you." Jones was crying.

### B.    *Marilyn Adams*

Marilyn Adams was Shaw's neighbor. On May 21, 2021, at 9:00 p.m. to 10:00 p.m., Adams went to Shaw's home to play cards. Coleman opened the door when Adams arrived and escorted her to the couch. Adams knew her as Teena. At the time, Adams had known her for about two years.

At some point, Adams heard a knock on the front door. Coleman said, "It's him" and opened the door. A man entered. Adams had never seen the man before. Adams believed that the man arrived alone.

The man began cussing at Coleman, who told him to stop cussing at her in front of her family members. The two exchanged words. Once they stopped arguing, Coleman showed Adams where to sit.

Adams saw Coleman take a stun gun out of her bra and use it on Jones. After Coleman used the stun gun, Jones said, " 'She

4

done stun-gunned me at least three times. Shoot her.' " According to Adams, Jones was talking to another man who entered the apartment. This other man was Black and wore a face mask. He entered five minutes after Jones, looked around, and told everyone to "be still." After Jones said, " 'Shoot her,' " the second man waved a dark colored handgun and said, " 'Don't nobody move' " or " 'Everybody be still.' " Adams, along with everyone else, fell to her knees. She saw the man fire the gun and she heard one shot. Adams heard Coleman say, " 'He shot me. He really shot me.' " Coleman put her finger over a hole in her right shoulder, got wobbly, kind of smiled, and fell to the ground.

After the shooting, Adams heard the name Cree as the person who told the shooter to shoot Coleman. At trial, she could not tell if Cree was in the courtroom. Adams testified that she could not remember if she told the responding deputy or the detective that Cree ordered the shooter to shoot Coleman. Adams testified that it was possible that she did not tell the responding deputy that Cree ordered the shooter to shoot Coleman. She had trouble remembering things from the night of the incident which was two years earlier.

### C.    *James Ramires*

On May 21, 2021, James Ramires went with his friend Red to the gathering at Shaw's apartment. Ramires took Coleman to a liquor store. Her ex-boyfriend approached her on a three-wheeled bike. They exchanged words. Coleman looked disturbed. Ramires knew Coleman's ex-boyfriend as Cree.

They returned to Shaw's apartment. After about 15 minutes, someone knocked on the door. When the door opened,

Cree entered, followed by another man. Ramires saw a gun in the second man's waistband.

Coleman began arguing with Cree for about five minutes. They began shoving one another. Ramires never saw Coleman strike Cree or use any weapon against him. Cree mentioned a gun and Coleman responded, "Who cares" or "whatever" and told him, "Shoot me then." Cree stated, "Shoot the bitch" and "you're going to die." Ramires heard a shot fired. Coleman turned to Ramires and said, "This fool shot me." Ramires grabbed her before she went to the floor. Coleman died in Ramires's arms. Ramires yelled, "Call 911." Immediately after the shot, Cree and his companion left the apartment. Ramires did not hear either of the men say anything while they were inside of the apartment after the shot was fired.

A minute or two after the shooting, Cree appeared at the screen door or sliding glass door. He was crying and distraught. He was trying to go inside the apartment and said, "Sorry."

### D.    *Deputy Raymond Gonzalez*

On May 21, 2021, Sheriff's Deputy Raymond Gonzalez responded to a call for a gunshot victim at 737 Jackman Street. Deputy Gonzalez spoke to a man who told him that the suspect was a Black man with a tricycle. Deputy Gonzalez found a red tricycle north of the apartment complex. Jones walked toward Deputy Gonzalez and other deputies and they detained him.

### E.    *Sergeant Christian Mezzano*

Sergeant Christian Mezzano and his partner Sergeant Guillermo Morales were assigned as homicide detectives for Coleman's death. They responded to the location where the incident occurred. According to Sergeant Mezzano, deputies

6

found a stun gun in the bedroom after it had been moved from the floor of the doorway and placed on the sofa. Sergeant Mezzano and Sergeant Morales also interviewed Shaw, Adams, Reginald "Badass" Hayes, Shirley "Shay" Geiger, Ivory "Papa Red" Johnson, and Carla Guice.

After the interviews, Sergeant Mezzano viewed a surveillance video recording that showed Jones and the other man who was wearing a face mask in the hallway outside of Shaw's apartment. The video showed the second man had a revolver in his left hand. The revolver's hammer was cocked back rendering it ready to fire. The gunman entered Shaw's apartment about 36 seconds after Jones. Less than two minutes later, the gunman exited with the revolver in his right hand and ran down the hallway. Jones exited about six to seven seconds later.

Sergeant Mezzano directed deputies to arrest Thomas. On May 24, 2021, deputies detained Thomas in a black Chevrolet. He was wearing the same shoes that the shooter was wearing on the night of the shooting as depicted in the video recording. A cellphone was found in the car. The phone contained three photos from May 7, 2021. The first photo showed Thomas holding a gun and wearing the shoes and clothing worn by the gunman as depicted in the video. The second photo showed Thomas's girlfriend holding a revolver. The third photo showed a blue steel revolver like the revolver held by the gunman as depicted in the video.

### F.    Other evidence

Dr. Brice Hunt from the Los Angeles County Department of the Medical Examiner concluded that Coleman was killed by a gunshot wound to the chest. Dr. Hunt determined that the barrel

7

of the firearm was five to six inches to a foot and a half from Coleman.

At trial, Jones's trial counsel and the prosecutor stipulated that on March 1, 2021, a court issued a criminal protective order against Jones, prohibiting him from contacting Coleman or coming within 100 yards of her.

## II. Procedure

Separate juries convicted Jones and Thomas of second degree murder (Pen. Code, § 187, subd. (a)[1]; count 1). Thomas's jury found that he personally used a firearm in the commission of the murder (§ 12022.5, subd. (a)). Thomas's jury also convicted him of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3). Jones's jury additionally convicted him of corporal injury on a person with whom he had a dating relationship (§ 273.5, subd. (a); count 2). Jones and Thomas admitted that they each had two prior felony convictions under the Three Strikes law (§§ 667, subds. (b)–(j), 1170.12, subds. (a)–(d)).

The trial court sentenced Jones to 45 years to life for count 1, calculated as the minimum term of 15 years tripled under the Three Strikes law. For count 3, the court imposed and stayed six years pursuant to section 654.

The court sentenced Thomas to 49 years to life for count 1, calculated as the minimum term of 15 years tripled under the Three Strikes law, plus an additional four years for the firearm enhancement. For count 2, the court imposed and stayed four years pursuant to section 654.

---

[1] All further undesignated statutory references are to the Penal Code.

# DISCUSSION

## I.    Denial of involuntary manslaughter instruction

The trial court denied Jones's request to instruct on involuntary manslaughter as a lesser included offense to murder. The court stated no evidence supported involuntary manslaughter.  Jones claims this was error.

### *A.    Applicable law*

"Murder is the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  "[M]alice may be express or implied."  (§ 188, subd. (a).)  Express malice is established by an intent to kill.  (*People v. Saille* (1991) 54 Cal.3d 1103, 1114.)  Implied malice does not require an intent to kill. (*People v. Swain* (1996) 12 Cal.4th 593, 602–603.)  Implied malice is formed when the killing "results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."  (*People v. Cook* (2006) 39 Cal.4th 566, 597 (*Cook*); *People v. Knoller* (2007) 41 Cal.4th 139, 143.)

Involuntary manslaughter is the unlawful killing of a human being without malice.  (§ 192, subd. (b).)  Section 192, subdivision (b) requires one of the following underlying acts:  "an unlawful act, not amounting to a felony," or "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  Courts have also identified nonstatutory underlying acts including one based on an inherently dangerous assaultive felony, which is pertinent in this case.  (*People v. Brothers* (2015) 236 Cal.App.4th 24, 33–34 (*Brothers*); *People v. Bryant* (2013) 56 Cal.4th 959, 974 (conc. opn.

9

of Kennard, J.); see *People v. Bryant* (2013) 222 Cal.App.4th 1196, 1205.)[2]

Involuntary manslaughter requires criminal negligence in committing the underlying act that endangered human life. (*People v. Ochoa* (1998) 19 Cal.4th 353, 423; *People v Mohamed* (2016) 247 Cal.App.4th 152, 161; *People v. Butler* (2010) 187 Cal.App.4th 998, 1007.)  Criminal negligence for involuntary manslaughter is based on an objective standard, that is, whether a reasonable person would have been aware of the risk of death involved.  (*Butler*, at p. 1008.)  By contrast, a defendant commits implied malice murder when he acts with conscious disregard for life and subjectively appreciates the risk of danger to human life. (*Ibid.*; *People v. Guillen* (2014) 227 Cal.App.4th 934, 1027; *People v. Luo* (2017) 16 Cal.App.5th 663, 670–671.)

Involuntary manslaughter is a lesser included offense of murder.  (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)  A trial court must instruct the jury on any lesser included offense supported by substantial evidence, which is "evidence that a reasonable jury could find persuasive."  (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 (*Barton*); *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*), disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)  The instruction is required when a reasonable jury could conclude that the lesser included offense, but not the greater offense, was committed.  (*Breverman*, at p. 162.)

---

[2]  Another nonstatutory underlying act is based on a noninherently dangerous felony accomplished "without due caution and circumspection."  (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, overruled in part on other grounds by *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)

We independently review the trial court's decision to not instruct on a lesser included offense. (*Cook*, *supra*, 39 Cal.4th at p. 596; *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1207.)

## B.  Aiding and abetting

"[A] direct aider and abettor to murder must possess malice aforethought." (*People v. Gentile* (2020) 10 Cal.5th 830, 848, superseded by statute on another ground as stated in *People v. Oyler* (2025) 17 Cal.5th 756, 836.) Liability as an aider and abettor to express malice murder requires, by act or advice, aiding, promoting, encouraging, or instigating the commission of the killing with knowledge that the direct perpetrator intended to commit the murder and the intent to aid the perpetrator in its commission. (*People v. Curiel* (2023) 15 Cal.5th 433, 468.) A direct aider and abettor of implied malice murder must, by act or advice, aid, promote, encourage, or instigate the commission of the life-endangering act. (*People v. Reyes* (2023) 14 Cal.5th 981, 991.) The requisite mental state is " 'knowledge that the perpetrator intended to commit *the* [life-endangering] *act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' [Citations.]" (*Ibid*.)

Reviewing courts have recognized aiding and abetting liability for involuntary manslaughter. (See *People v. Oliver* (1989) 210 Cal.App.3d 138, 150–151.) For example, a reviewing court affirmed a conviction for involuntary manslaughter as an aider and abettor when the defendant prevented others from intervening in the direct perpetrator's fatal assault against the victim. (*People v. Le Grant* (1946) 76 Cal.App.2d 148, 153–154, abrogated on another ground recognized in *People v. Cox* (2000) 23 Cal.4th 665, 675.)

11

### C.     *No substantial evidence of the absence of malice*

As the shooter, Thomas was liable for murder on a direct perpetrator theory for shooting Coleman.  Jones was liable for murder as an aider and abettor to Thomas's commission of murder.  Jones asserts that Thomas's commission of the shooting was an inherently dangerous assaultive crime that formed the underlying act for involuntary manslaughter.  Substantial evidence of the absence of malice must exist to justify an instruction on involuntary manslaughter.  (*Brothers*, *supra*, 236 Cal.App.4th at pp. 33–35.)

To support the absence of malice, Jones relies on Shaw's testimony that after Coleman was shot, she heard him express that he did not want to kill her.  We reject Jones's argument.

At the outset, we question whether Jones made the alleged statement.  The only evidence to support it came from Shaw.  But she was inconsistent.  Shaw initially testified that she did not hear Jones say, " 'Why did you shoot her?' " or " 'I didn't want you to shoot her.' "  She changed her testimony and said she heard Jones say, "I didn't want her dead. I didn't want to kill her,"  or " 'I didn't want to shoot you.  I didn't want to kill you.' "  Shaw continued to change her testimony by saying that she heard Jones say, " 'I didn't want her to die.' "  Shaw also testified that Jones said, "I didn't want you to kill her,"  or " 'I didn't want him to shoot her.' "

Any version of the statement does not amount to substantial evidence to support the absence of malice.  We observe that Jones expressed either that he "didn't want" Coleman to die or "didn't want" to kill her or have her killed.  The statements amounted to Jones's mere remorse after his anger subsided.  They reflected Jones's post-shooting realization that

12

killing Coleman was not a desirable or ideal outcome for his choice to retaliate for her hostility to him. Jones continued to demonstrate this remorse when he returned to Shaw's apartment after the shooting and approached her sliding glass door, stating, "I didn't want nothing to happen to you." But intentional killers can be remorseful for their killings. Remorse does not render the killing unintentional.

Jones revealed his intent to kill by telling Coleman that she was "going to die" and ordering Thomas to "shoot the bitch." Jones prompted Thomas to shoot Coleman as he was five to eighteen inches away, allowing the shot to strike her chest and hit her lung and a major artery from her heart. This manner of killing further supports the inference that Jones, as well as Thomas, intended to kill Coleman. (*People v. Smith* (2005) 37 Cal.4th 733, 742; *People v. Woods* (1991) 226 Cal.App.3d 1037, 1048 [shots directed to the victim at close range supported intent to kill].) Under such circumstances, Jones's statement of remorse would not negate his intent to kill to support an involuntary manslaughter instruction. (*People v. Hendricks* (1988) 44 Cal.3d 635, 643 [no involuntary manslaughter instruction required when defendant shot two victims at point blank range, even though he later denied intent to kill]; *People v. Ibarra* (1982) 134 Cal.App.3d 413, 420 [one line denial of intent to kill was not substantial enough to support involuntary manslaughter when defendant pointed gun three or four feet from victim's chest].)

But even if Jones's single sentence somehow negated his intent to kill or express malice, substantial evidence established implied malice. The court in *Brothers*, *supra*, 236 Cal.App.4th at page 34 addressed such a scenario. Brothers repeatedly beat the decedent on the head and face with a broom handle. She left the

13

scene only after her companion forced a gag down the decedent's throat and he stopped moving. (*Ibid*.) In arguing that the trial court should have instructed on involuntary manslaughter, Brothers relied on her testimony that she did not know " 'this was going to happen.' " (*Ibid*.) The reviewing court assumed Brothers meant she did not intend to kill the decedent but determined that there was "no evidence from which a reasonable juror could entertain a reasonable doubt that Brothers had acted in conscious disregard of the risk her conduct posed to [the victim]'s life." (*Ibid*.)

The court concluded that this formation of implied malice precluded an instruction on involuntary manslaughter, even if evidence negated intent to kill. (*Brothers*, *supra*, 236 Cal.App.4th at p. 35.) The court reasoned, "Otherwise, an involuntary manslaughter instruction would be required in every implied malice case regardless of the evidence." (*Ibid*.)

From Jones's actions and the circumstances before the shooting, we can infer his subjective awareness of the risk of death posed by Thomas's shooting Coleman and his conscious disregard for life by his order to shoot. Jones's proclamation to Coleman that she was going to die supports his awareness of the risk of death. He consciously disregarded Coleman's life with his order to Thomas, who was within close range of her and held a loaded revolver with its hammer cocked back, rendering it ready to fire. (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1273–1274 ["Pulling the hammer back on a loaded gun and pointing it at another" is evidence of implied malice].)

Jones concedes that the jury could have concluded that he "acted with conscious disregard" for Coleman's life "by urging Thomas to shoot her." But Jones asserts that "the jury could

14

have also concluded that [he] in aiding and abetting Thomas acted with a mental state consistent with gross negligence" because he "denied that he wanted Thomas to kill Coleman."

We reject Jones's argument. His alleged statement about not wanting Coleman killed fails to support gross negligence as a possible alternative to implied malice. But even if it did, as the Supreme Court has repeatedly stated, " '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.]' " (*People v. Taylor* (2010) 48 Cal.4th 574, 623; *People v. Vargas* (2020) 9 Cal.5th 793, 827.)[3] As stated, the circumstances prior to the shooting refute any interpretation of Jones's alleged statement that would suggest he gave the order without realizing the risk involved or that the order was not made in conscious disregard to life.

---

[3]     Jones asserts that a lesser included offense instruction must be given "no matter how weak" the evidence, citing *People v. Garcia* (1967) 250 Cal.App.2d 15, 17. But this assertion directly contradicts nearly 50 years of Supreme Court cases since *Flannel,* which disapproved of any decision that "require[s] instructions without evidence substantial enough to merit consideration." (*People v. Flannel* (1979) 25 Cal.3d 668, 684–685 & fn. 12, superseded by statute on other grounds as stated in *People v. Elmore* (2014) 59 Cal.4th 121, 138; *Barton, supra,* 12 Cal.4th at pp. 194–195, fn. 4.) "[E]ven on request, a trial judge has no duty to instruct on any lesser offense *unless* there is substantial evidence to support such instruction." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.)

### D. *Harmless error*

Even if we assumed that the trial court erred by not instructing on involuntary manslaughter, that error was harmless. In a noncapital case, the failure to instruct on a lesser included offense supported by substantial evidence is prejudicial only if the defendant demonstrates that it is " ' " ' "reasonably probable" ' " ' " that a more favorable result would have been reached if the court had given the instruction. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196, 198; *Breverman*, *supra*, 19 Cal.4th at p. 165; see *People v. Watson* (1956) 46 Cal.2d 818, 837.)

In addition to murder, the trial court instructed the jury on heat-of-passion voluntary manslaughter, which requires a higher degree of culpability than involuntary manslaughter. The jury's conviction of murder and rejection of the lesser option render harmless any error in not instructing on the lesser included offense of involuntary manslaughter. Had the court instructed the jury on involuntary manslaughter, it is not reasonably probable it would have chosen that option. (*People v. Rogers* (2006) 39 Cal.4th 826, 884; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.)

Any error in declining to instruct on involuntary manslaughter also would not have rendered Jones's trial fundamentally unfair, as he argues. In closing argument, defense counsel still asserted that Jones did not intend to kill Coleman and did not act with conscious disregard for life, even without the involuntary manslaughter instruction. The jurors simply rejected these arguments. By convicting Jones of second degree murder, they determined that he acted with malice.

16

## II. Failure to present evidence of Thomas's mental condition

Thomas's appellate counsel argues that his trial counsel rendered ineffective assistance by failing to present evidence of his mental condition. Appellate counsel specifically claims this evidence "would have persuaded the jury that [Thomas] did not act with express malice, that he did not actually form the intent to kill or more fundamentally that [his] history of mental illness warranted a level of consideration, if not mercy, that might not have technically been covered by the panoply of possible verdicts, but could have resulted in an acquittal." We reject appellate counsel's arguments.

### A. *Evaluation by Dr. Robert Schug*

Prior to trial, a psychologist named Robert Schug examined Thomas. On June 15, 2023, Dr. Schug prepared a report that addressed Thomas's "mental condition" and the existence of "any mitigating factors to consider prior to sentencing." Dr. Schug reviewed Thomas's mental health records[4] which indicated that he was diagnosed with 19 mental disorders, including ADHD, PTSD, bipolar disorder, explosive disorder, depressive disorder,

---

[4]     At one point in his opening brief, appellate counsel mentions that trial counsel failed "to investigate and use at trial [his] well-established mental health defenses." We disagree. Trial counsel did investigate Thomas's mental health condition. The report of Thomas's psychological evaluation lists the multiple mental health records provided by trial counsel. Even appellate counsel unartfully acknowledges that trial counsel "had it all, and it was 'voluminous'. . . . [R]eams and reams of evidence establishing that his client . . . was in common parlance, 'cuckoo.'"

17

oppositional defiant disorder, anxiety disorder, impulse control disorder, psychotic disorder, conduct disorder, alcohol related disorder, cannabis dependence, dysthymic disorder, antisocial personality disorder, and intellectual disability.[5]

Dr. Schug concluded that Thomas met the formal diagnoses for intellectual disability of moderate severity and alcohol use disorder. Dr. Schug observed that Thomas appeared "vulnerable to being drawn, perhaps unwillingly, into future acts of violence and aggression—acts he may not necessarily have willfully chosen had he not been in close proximity to other individuals already marked by such behavior." Dr. Schug observed that Thomas's "problematic relationship with [Jones] . . . antisocial peers . . . and violent attitudes" could be seen as "motivators for the crimes." While acknowledging the existence of mitigating factors for sentencing, Dr. Schug opined that Thomas posed a moderate level of risk for re-offense based on his background and the nature of the offenses.

---

[5] Thomas's appellate counsel uses the term " 'mental retardation.' " The United States Supreme Court in *Hall v. Florida* (2014) 572 U.S. 701, 704–705, used the term " 'intellectual disability,' " consistent with the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013). (*People v. Boyce* (2014) 59 Cal.4th 672, 717, fn. 24.) The California Legislature replaced the term " 'mentally retarded' " with the term " 'intellectual disability' " when it amended section 1376, which establishes procedures for the determination of intellectual disability in capital cases. (*Boyce*, at p. 717, fn. 24.) Consistent with the Supreme Court and the California Legislature, we use the term " 'intellectual disability.' "

### B.   *No deficient performance by counsel*

To establish ineffective assistance of counsel, Thomas " 'must show that counsel's performance was deficient.' [*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).]"  (*People v. Ledesma* (1987) 43 Cal.3d 171, 216.)  He must also show a "reasonable probability" that he would have received a more favorable result had counsel's performance not been deficient.  (*Strickland*, at pp. 693–694; *Ledesma*, at pp. 217–218; *People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)  "[C]ounsel has wide latitude in deciding how best to represent a client."  (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5–6.)

On direct appeal, a conclusion that counsel's performance was deficient depends on whether "the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, . . . counsel was asked for a reason and failed to provide one, or . . . there simply could be no satisfactory explanation."  (*Mai*, *supra*, 57 Cal.4th at p. 1009.)  The absence from the record of a tactical purpose for the challenged act or omission will not establish ineffective assistance of counsel on appeal unless " 'no conceivable reason' " could exist for that act or omission.  (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)  Without determining whether the record discloses no rational tactical purpose for declining to present evidence of Thomas's mental condition, we observe that conceivable reasons exist.

Thomas's appellate counsel overstates the materiality of the evidence of his mental condition.  We recognize that under section 28, subdivision (a), evidence of a mental disorder can be relevant to negate the requisite mental states of deliberation and premeditation for first degree murder and malice aforethought

19

for second degree murder.[6] But Dr. Schug did not evaluate Thomas for a section 28, subdivision (a) defense. Not surprisingly, Dr. Shug's report did not include an opinion that Thomas was unable to form any requisite mental state during the commission of the murder. Instead, he stated that Jones or other "antisocial peers" and "violent attitudes" could have motivated Thomas to commit the crimes.

Appellate counsel concedes that Dr. Schug's report did not address how or whether Thomas's mental condition impacted his mental state when shooting Coleman or supported theories of defense of others[7] and voluntary manslaughter based on sudden quarrel. He simply argues that because the report did not disclose any opinion, trial counsel should have called Dr. Schug as a witness to explore whether Thomas's mental condition could have impacted his mental state.[8] But Thomas's suggestion would require presenting evidence of a mental condition in every trial when the defendant was charged with a specific intent crime, regardless of whether that mental condition was relevant to negating the specific mental state.

---

[6]    Section 28, subdivision (a) states, "Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

[7]    The trial court denied Thomas's request for an instruction on imperfect self defense. On appeal, Thomas does not claim that the trial court's denial of the instruction was error.

[8]    Without citing any authority, appellate counsel claims, "In the real world of trial practice, an attorney in defense counsel's shoes never fails to call the medical expert. Never!"

Calling any witness without knowing the substance of their proposed testimony is a gamble. Here, Dr. Schug's report does not indicate any opinion about Thomas's mental state during the commission of the shooting. We cannot conclude that during testimony, he would have formed an opinion favorable to the defense. Conceivably, trial counsel either discovered prior to trial that Dr. Schug was unable to form such an opinion and decided not to call him as a witness, or he was unwilling to take the chance that Dr. Schug would not have formed the opinion during testimony. Either way, trial counsel was not deficient for declining to call Dr. Schug as a witness.

Trial counsel may have also conceivably decided that incorporating a defense based on Thomas's mental condition would detract from his primary theory that Jones took the gun from him and shot Coleman. During closing argument, trial counsel asserted that Thomas denied shooting Coleman during his interview with the detectives.[9] Thomas's denial to the detectives conceivably compelled trial counsel to focus on that theory to avoid awkwardly asking the jury to ignore his client's version of the facts.[10] Developing a theory consistent with

---

[9]      In closing argument, trial counsel referred to Thomas's interview and mentioned that it was presented to the jury by the prosecutor, but it is not part of the appellate record.

[10]      We recognize that during closing argument, trial counsel mentioned secondary theories of voluntary manslaughter and second degree murder that assumed Thomas was the shooter. But trial counsel abbreviated his discussion of these secondary theories to avoid distracting the jury with a version of the facts that was inconsistent with his primary theory that Thomas was not the shooter. We cannot second guess this decision. (*Strickland, supra,* 466 U.S. at p. 689.)

Thomas's statement preserved trial counsel's credibility with the jury.

Trial counsel could have concluded that he had the best chance of prevailing with this theory, particularly because of other evidence that supported Thomas's version of the facts. For example, the detectives who interviewed Thomas observed an injury on his lip. Thomas told them that he sustained the injury when Jones hit him in the mouth and took the gun from him to shoot Coleman. To further support the theory, counsel focused his cross examination of Shaw on her limited observation of the shooter by questioning her vantage point, the conditions of her observation, and her inability to recall details about the shooter's appearance. Counsel also argued that Coleman taunted Jones, not Thomas, by saying, "just shoot me." Counsel based this argument on Coleman's fight with Jones, who projected his anger at her for not relinquishing his belongings.

Finally, appellate counsel asserts, "And, while this court may not wish to consider it, appellant's jury awash in evidence that paints appellant as sympathetic, my [*sic*] have decided the case based on some level of nullification. Like it or not, it happens." He further claims, "[T]he jury could have felt sorry for appellant and the verdict may have been very different." But counsel's performance was not deficient for failure to present evidence to persuade the jury to nullify based on sympathy. As the Attorney General points out, any such effort by counsel would have conflicted with the trial court's instruction to the jury to not be influenced by "pity" or "sympathy" for the defendant. (See CALJIC No. 1.00.)

### C.    *No prejudice*

Even if Thomas presented evidence of his mental condition, he would not have received a more favorable result.

First, the jury acquitted Thomas of first degree willful, deliberate, and premeditated murder and convicted him of second degree murder.  Any mental disorder defense under section 28, subdivision (a) would not have made any difference with deliberation and premeditation.

Second, trial counsel was confronted with overwhelming evidence of malice.  Thomas shot Coleman at close range with the same gun he was holding in a photograph found by the deputies.  The range at which he fired the gun and his familiarity with it support his intent to kill or express malice, as well as the subjective awareness of the risk of death by firing the gun.  Thomas fired the shot after Jones said, "shoot the bitch" and told her, "you are going to die."  This sequence of Jones's statement and Thomas's firing the gun supports the inference that Thomas shot Coleman to kill her.

As stated, Dr. Schug did not opine as to whether Thomas's mental condition negated malice or caused him to act under the direct and immediate influence of a sudden quarrel at the time of the shooting.  We have no way of knowing whether Jones psychologically influenced Thomas.  It is impossible to say that a more favorable result would have been achieved had the evidence been admitted.  Given the vague probative value of the evidence of Thomas's mental condition and the overwhelming evidence that established malice, we conclude that Thomas was not prejudiced by the failure to present the mental condition evidence.

23

## III. Prosecutorial misconduct or outrageous governmental conduct

Thomas next complains that the Sheriff's deputies failed to separate potential witnesses, allowing them to discuss the incident together while they waited to be individually interviewed. He asserts that each witness's personal recollection could not be separated from those of the others in the group. He further accuses the prosecutor of encouraging perjury and soliciting false testimony by calling these witnesses at trial. Based on the cases he cites, Thomas appears to argue that the prosecutor committed misconduct under the federal and state standards. Finally, Thomas contends that his trial counsel was ineffective for failing to move to exclude the tainted witness testimony. We reject Thomas's arguments.

### A. *Relevant facts*

After the incident, Sheriff's deputies arrived at Shaw's apartment. She spoke with a deputy named Ramirez in the hallway of her apartment. At trial, Shaw testified that she was truthful when she spoke with him and did not purposefully omit anything.

According to Shaw, the deputies transported her from her apartment to the Sheriff's station. When Shaw and the other witnesses arrived, the deputies placed them in the same room. The deputies called each witness one at a time to speak in another room. The witnesses commented on how they were waiting a long time. According to Shaw, the witnesses were not really talking about what had happened because they were not supposed to talk to one other about the incident. Shaw testified that the witnesses "did discuss it a little bit."

### B.    *No prosecutorial misconduct*

A prosecutor's misconduct violates the Fourteenth Amendment when "it infects the trial with such unfairness as to make the conviction a denial of due process."  (*People v. Morales* (2001) 25 Cal.4th 34, 44; *People v. Thomas* (2012) 54 Cal.4th 908, 937; *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) Prosecutorial misconduct that does not render the trial fundamentally unfair constitutes misconduct under California law if it involves the use of "deceptive or reprehensible methods to attempt to persuade . . . the jury."  (*Morales*, at p. 44; *People v. Otero* (2012) 210 Cal.App.4th 865, 870; *People v. Wallace* (2008) 44 Cal.4th 1032, 1070–1071.)

To preserve a claim of prosecutorial misconduct, a defendant must make a timely and specific objection and request that the trial court admonish the jury.  (*People v. Gamache* (2010) 48 Cal.4th 347, 371.)  Thomas recognizes that trial counsel did not object or request to exclude any testimony when Shaw informed him during cross examination that the witnesses were in the same room prior to interviewing.  Trial counsel's failure to object forfeits the issue for appeal.  Even on the merits, we reject Thomas's claim and any claim of ineffective assistance for failing to object. (See *People v. Thompson* (2010) 49 Cal.4th 79, 126–127 & fn. 16.)

Thomas has cited nothing in the record to support his claim that the witnesses testified falsely or changed their versions of the event based on conversations among one another while waiting at the Sheriff's station.  No witness testified that they either lied to the deputies or lied in court.  Shaw testified that she was truthful when she spoke with the deputies.  The record

25

contains no details of any conversation in which the witnesses were engaged.

Nothing showed that any consistency between the witnesses was the product of a conversation at the Sheriff's station, rather than a witness's independent recollection. On the contrary, the witnesses testified to different details which support the inference that no one aligned with another witness's account and that each witness preserved their individual recollections. For example, all three testified about Jones ordering Thomas to shoot Coleman, but each gave different details that led to the order. Shaw testified that Coleman sprayed mace on Jones, while Adams testified that she used a stun gun three times. Ramires did not mention anything about either a stun gun or spray. But he was the only one to say that Jones warned Coleman about a gun and that Coleman responded, "Who cares" or "whatever" and told him, "Shoot me then," prior to his order to shoot.

The record includes minimal evidence of witnesses having contact with one another or learning information from them after the incident. For example, Ramires testified that he had spoken to Shaw once since the incident and they did not discuss the details of it. Additionally, Adams revealed that she learned of the name Cree from people talking after the shooting. But no evidence suggests that she learned the name from a conversation at the Sheriff's station rather than at the scene of a shooting. It is important to keep in mind that the witnesses knew one another directly or through Shaw. It is unrealistic that they would have completely terminated contact with one another after the incident.

Defense counsel also tried to establish that Adams added information during a second interview with deputies that she did not include in her initial interview with the responding deputy. Adams initially testified that she did not remember and was not sure. She later testified that it was "possible" that she did not tell the responding deputy that Cree ordered the second man to shoot Coleman but did tell the detective during her subsequent longer interview.

None of these examples leads us to conclude that any post-incident discussion at the Sheriff's station influenced or caused any witness to lie or change his or her story. Because the record does not support Thomas's claim that any witness testified falsely, we reject his argument that the prosecutor "effectively encouraged perjury and solicited false testimony." We conclude that the prosecutor did not engage in misconduct by calling the witnesses to testify. Presenting her case with these witnesses was not "deceptive or reprehensible." Nor did calling them to testify render the trial fundamentally unfair.

## C. *No outrageous governmental conduct*

Thomas also contends that the detectives[11] engaged in misconduct by permitting the witnesses to wait in the common room prior to interviewing. He asserts that the alleged misconduct violated his due process right to effectively examine the witnesses. We reject Thomas's argument.

The United States Supreme Court introduced the concept of an outrageous governmental conduct defense in *United States*

---

[11] Thomas refers to the persons who conducted the interviews as deputies, but the record identifies them as homicide detectives

*v. Russell* (1973) 411 U.S. 423, 428–431 (*Russell*).  In a prosecution for drug manufacturing, the defendant in *Russell* claimed that an undercover officer engaged in criminal activity by supplying an ingredient for the drug that could not have otherwise been obtained.  (*Id.* at pp. 431–432.)  The Court rejected the claims that the ingredient was impossible to obtain and that the officer's action was indispensable to committing the offense.  But the Court left open whether outrageous governmental conduct could violate due process and bar prosecution.[12]  (*Ibid.*)

Assuming the viability of the defense,[13] we conclude that the detectives did not engage in outrageous misconduct by allowing the witnesses to remain together while awaiting their interviews.[14]  The detectives instructed the witnesses not to

---

Sergeant Mezzano and Sergeant Morales.  We refer to them as detectives to maintain consistency with the record.

[12]     Similarly, the California Supreme Court has declined to decide the viability of an outrageous governmental conduct defense.  (*People v. Smith* (2003) 31 Cal.4th 1207, 1227 (*Smith*).)

[13]     Justice Werdegar's concurring opinion in *Smith* described the claim of outrageous governmental conduct to be a bar to prosecution, rather than an affirmative defense.  Procedurally, it would be properly raised by a pretrial motion and decided by the trial court.  (*Smith, supra*, 31 Cal.4th at p. 1228 (conc. opn. of Werdegar, J.).)  Under this view, Thomas has forfeited his claim because he did not raise it below.

[14]     Thomas argues that by allowing the witnesses to remain together prior to their interviews, the detectives knowingly or negligently made them testify untruthfully, violating the federal witness tampering statute (18 U.S.C. § 1512).  We are not

speak to one another. The detectives interviewed each witness separately, which would avoid any exposure of their account to the other witnesses. The record does not show that the detectives ever coerced any witness, affirmed any witness's account, or told them that a particular observation was correct, as Thomas points out is a concern with suggestive eyewitness identification procedures. Nothing about the detectives' interviewing process violated " 'fundamental fairness, shocking to the universal sense of justice,' " which *Russell* suggested as the standard for the defense of outrageous governmental conduct. (*Russell*, *supra*, 411 U.S. at p. 432.)

### D. *No ineffective assistance of counsel for failure to exclude testimony*

Because we reject the prosecutorial misconduct and outrageous governmental conduct allegations, we also reject any claim of ineffective assistance of counsel for failing to move to exclude the witnesses' testimony on those grounds. A reasonably competent attorney would have similarly assessed such an attempt to exclude the witnesses' testimony as futile. (*People v. Price* (1991) 1 Cal.4th 324, 387; *People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091.)

persuaded. This federal statute is inapplicable to this prosecution and the facts involved. The record does not support Thomas's contention that the witnesses falsely testified, as we stated earlier.

## DISPOSITION

We affirm the judgments.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

HANASONO, J.

We concur:

EDMON, P. J.

ADAMS, J.